George H. Dauler, Robert C. McNamara, Amos O. Taylor, William Hartley, James Boor, J. M. Hedding, J. M. Shoemaker and Edwin W. Middleton *v.* John G. Hartley and William Hartley, Jr., doing business as Bankers under the firm name of J. G. Hartley & Co., J. M. Campbell, Geo. W. Kirk, and Geo. W. Kirk, Operator for J. M. Campbell.  Appeal of J. M. Campbell. ·

[Marked to be reported.]

*Contract—Wagering contract—Stockholder.*

So long as money staked on the result of a wager remains in the hands of the stakeholder it belongs to the person from whom it came, and may be withdrawn by him notwithstanding the loss of the bet, and without the consent of the other party to the contract. ·

A deposit of money with third persons who are stakeholders, for the purpose of being used by a broker as margins in the mere purchase and sale of differences in the market prices of stocks and grain, without actual purchases or sales of stocks or grain in specie, is a mere wagering contract, and if the money is still in the hands of the stakeholder and not paid over to the person who made the transaction, it may be recovered back.

*Equity — Mutual accounts—Interpleader—Multiplicity of suits—Inadequate remedy at law.*

Several persons deposited money with one of two defendants in a bill

in equity as a stakeholder, to be used by the other defendant in stock gambling transactions. The bill was filed after the transactions had been made, but before the money had been paid over by the stakeholder to the second defendant. *Held*, that equity had jurisdiction over the case.

Argued May 12, 1896. Appeal, No. 87, Jan. T., 1896, by J. M. Campbell, from decree of C. P. Bedford Co., Feb. T., 1891 No. 1, on bill in equity. Before STERRETT, C. J., GREEN, MC-COLLUM, MITCHELL and FELL, JJ. Affirmed.

Bill in equity for an account and injunction.

The case was referred to J. G. Russell, Esq., as master and examiner.

The master found that the plaintiffs and the defendants all resided in Bedford County, Pennsylvania, at the time of the transactions in controversy, except J. M. Campbell, who resided in Pittsburg, and carried on the business there of a general broker in stocks, grains, etc. He had special wires under an arrangement with a telegraph company, which he hired out to persons in various parts of the country who were engaged in the business of brokers.

About the beginning of July, 1891, George W. Kirk opened a room called the stock exchange in the borough of Bedford, Pa., which was continued until the beginning of December following, in which were posted the daily market quotations on stocks, produce and the like. The plaintiffs went to this room and there engaged in buying and selling said articles on the belief and representations of said Kirk that he was the operator at Bedford for the said J. M. Campbell, and that all transactions by them were had with Campbell through Kirk.

In the purchase or sale of stock, grain and the like, any of the plaintiffs directing sales or purchases placed certain sums as margins in the hands of said Kirk under the distinct agreement with Kirk and J. G. Hartley & Co. that Kirk would deposit the money with J. G. Hartley & Co., bankers, as holders for all the parties interested; that the money was to be put to the account of J. M. Campbell, but said account was a conditional one; the funds were not to be withdrawn from the bank or paid over to Campbell without the consent of the parties who advanced the same, nor until the transactions were closed according to the conditions of the sale or purchases on which the

moneys were staked, and the bank so received the money and agreed to so hold the funds.

The amount of money paid in as margins or advanced as above by the different plaintiffs was as follows: by Dauler, $1,745; by Hartley, $315; by Hartley and Taylor, $3,120; by Shoemaker, $560; by McNamara, $530; by Boor, $320. The balance in the bank of J. G. Hartley & Co. on November 30, 1891, was $6,384.48.

The other facts which are material to an understanding of this case appear by the opinion of the court below.

The master made a pro rata distribution of the balance in bank among the plaintiffs.

The court, LONGENECKER, P. J., filed the following opinion :

The findings of fact and law by the master do not appear in consecutively numbered paragraphs, as is usual under our rule of court, but are found in the form of answers given in response to requests from both sides. This, though not the most convenient arrangement, seems to comply substantially with the equity rules adopted January 15, 1894.

While there is some conflict between the bill and answer and in the testimony, it does not seriously affect the material questions upon which, as it seems to us, the case must be determined. In stock gambling transactions, like these, it is not strange the participants should differ as to the terms on which they dealt. From Campbell and Kirk down to the last customer they did not pretend to own a dollar's worth of the commodities in which they assumed to be dealing. Nothing was actually bought or sold in Bedford or elsewhere, but it was a mere matter of wagers, of bookkeeping and the adjustment of balances. The master finds in answer to the plaintiffs' request, that Campbell "acknowledges that he took the trades himself and did nothing towards investing the funds he received in the articles which were supposed to be bought and sold." The business was, therefore, all confined to the little circle made up of Campbell, Kirk and their customers at Bedford.

The profit of one was the loss of another of their number. Each party negotiated with reference to keeping its grasp on the fund, against the inevitable day of reckoning, which was sure to come under such a state of business. Distrusting each

other, they each sought to so frame the papers and arrange for the security of the deposits as to guard against the other controlling them.   It was a scramble for advantage, in which they could not be expected to agree as to the precise terms of contract.   Upon one thing, however, all are agreed; namely, that so far as the fund now in dispute is concerned, it represents the pure, unmixed margins arising on their stock gambling transactions.   This is asserted as to the nature of the business in the bill and answers; is sworn to by all the witnesses, contended for in the requests and points submitted to the master on both sides, found by him and again bitterly insisted upon on the final argument.   It is denied by no one, and may be accepted as a settled fact.

Another matter which is clear of controversy is the fact that the fund is not in the hands or control of either of the contending parties, but in the banking house of J. G. Hartley & Co., a third party, which however has no interest in the results of the ventures or the fund itself.   The plaintiffs placed it there in the form of stakes or margins, and now seek to recover it. Campbell concedes this, but resists a recovery on the ground that it belongs to him as the result of his winnings and because the greater portion of it was credited to his name on the books of the bank.

The main contention of the counsel for defendants is that the claim of the plaintiffs rests on an illegal foundation, on transactions which are against the policy of the law, and that the presentation of their case involves a disclosure of this fact, and hence a court will not lend itself to aid them, but will leave them where it finds them.   This would clearly be so if there had been a final execution of the wagers by payment to the winner.   It is not necessary to refer to the multitude of authorities sustaining this well recognized doctrine.   But we think it is as well settled that so long as the money remains in the possession of a third party, who confessedly has no right to retain it, the party placing it there may recover it.   This is especially true when notice of the desire to do so is given before the event occurs upon which it is staked.

It has not, of course, been usual in operations on margins, to place the wager with a stakeholder, and hence no precedent is found in the books of an effort to recover margins from such a

depositary. But here the parties selected one, who now has the fund in litigation. The master expressly finds in answer to the defendants' 11th point that the bank was a "stakeholder," and in this we think he was fully sustained. Kirk testified that the money was to be held in the bank for the use of the people who put it in, and the plaintiffs and bank officer all say that the bank was designated to perform that office between the parties.

A "stakeholder" is defined in the Century Dictionary to be "in law, one holding a fund which two or more claim adversely to each other." In Rapalje and Lawrence's law dictionary, "stakeholder primarily means a person with whom money is deposited pending the decision of a bet or wager (q. v.), but it is more often used to mean a person who holds money or property which is claimed by rival claimants, but in which he himself has no interest." In the 23 Am. & Eng. Ency. of Law, p. 18, "a stakeholder is a depositary for both parties of money advanced by them, respectively, with a naked authority to deliver it over upon the proposed contingency. He is not regarded as a party to the illegal contract."

Can the plaintiffs recover back the margins deposited with Hartley & Co.? It has been repeatedly held that while the stake continues in the custody of the holder, it may be sued for. "When the action is against the stakeholder before its payment and after notice not to pay it over, the money may be recovered back:" Cotton v. Thurland, 5 Term R. 406. In McAllister v. Hoffman, 16 S. & R. 147, GIBSON, C. J., said, "The result of the authorities undoubtedly is, that the loser may withdraw his stake at any time before actual payment to the winner." And this he asserts of wagers void only at common law and without reference to statutory enactments. In the case of Forscht v. Green, 53 Pa. 138, a recovery from a stakeholder was had, though notice not to pay to the winner was given only after the event had taken place. It being an election bet, the court held he could then sue for his money, and that he could have done so prior to the act of 1839. The rule is thus stated in the elaborate note to Godsall v. Boldero, 2 Smith's Leading Cases, part 1, 8th ed., page 319, "But it is held in general, that so long as the money staked on the result of a wager, remains in the hands of a stakeholder, it belongs to the

person from whom it came, and may be withdrawn by him, notwithstanding the loss of the bet, and without the consent of the other party to the contract. A notice not to pay will operate as a countermand of the authority implied by the original deposit, and a subsequent payment will be no defense to an action for money had and received." It further states, "the law was so held in Vischer v. Yates, 11 Johns. (N. Y.) 23, and although this decision was overruled by Yates v. Foot, 12 Johns 1, it is sustained by the course of decision throughout this country, which establishes that the position of the stakeholder in such cases, is that of a mere agent or bailee," etc., and the views thus expressed are then fortified by the citation of numerous authorities. "If the authority is actually revoked before the money is paid over, it remains a naked deposit to the use of the depositor:" SHAW, C. J., in Ball v. Gilbert, 12 Met. (Mass.) 397. In Stacy v. Foss, 19 Me. 335, it was held immaterial that the notice to the stakeholder came after the happening of the event on which the wager depended, so it was before payment to the winner. And to the same effect is Gilmore v. Woodcock, 69 Me. 118; s. c. 31 Am. Rep. 255.

"The rule is general, both in England and this country, that when a wager is made and the stakes are deposited with the stakeholders, either party may, at any time before the result is ascertained and the money paid over to the winner, withdraw from the illegal transaction, notify the stakeholder and demand and recover his deposit money:" Lewis v. Bruton, 49 Am. Rep. 816 (74 Ala. R. 317), and cases there cited. In Wilkinson v. Tousley, 10 Am. Rep. 144, (16 Minn. Rep. 299), it is said, "The other question presented by the case at bar is, whether money bet upon an illegal wager can be recovered by the loser of the stakeholder, if before paying it over to the winner, the stakeholder has been notified by such loser not to pay it over and the loser has demanded its repayment to himself. There is a remarkable approach to unanimity in the authorities in answering this question in the affirmative," citing a large number of authorities. The case of Deaver v. Bennett, 26 Am. St. Rep. 415, (29 Neb. Rep. 812), contains the following in the opinion of the court: "At common law, where the wager is illegal, either party may claim the money deposited by him, from the stakeholder, even after the wager is decided against him, if the demand is

made before the money is actually paid over." To the same effect was the case of Riddle v. Perry, 19 Neb. Rep. 505. The same doctrine is also clearly announced in Bernard v. Taylor, 37 Am. St. Rep. 693.

A. C. Freeman, Esq., the compiler of the American Decisions, in his note to the case of Downs v. Quares, 12 Am. Dec. 339, says, "It is the universally accepted doctrine that no action in affirmance of an illegal wager can be maintained, but that actions which proceed upon a disaffirmance of the contract as illegal and void may be sustained while the contract is executory. Under the English decisions, which have been followed in most of the United States, the contract is considered executory until the money depending upon the result of the wager has been actually paid to the winner. In accordance with this view, where the articles wagered are placed in the hands of a stakeholder, the determination of the event does not execute the contract, and an action on the part of the loser will lie to recover what he has deposited with the stakeholder."

"Which of the parties is the more blamable, is quite immaterial:" Spring Company v. Knowlton, 103 U. S. 60. See also, Seigel v. Funk, 3 Pitts. R. 28.

These authorities, together with Alford v. Burke, 68 Am. Dec. 457; Hardy v. Hunt, 70 Am. Dec. 788; Tarleton v. Boher, 44 Am. Dec, 360; App v. Coryell, 3 P. & W. 494, and Conklin v. Conway, 18 Pa. 329, cited by the master, seem to sustain quite fully the right of the depositor to recover his stake at any time before it has really passed into the hands of the winner. And as the law puts operations in mere margins on the same footing as other wagering contracts, we think the foregoing authorities apply with equal force to the case at bar.

The right to recover is not dependent on statutory authority, as was contended by counsel for the defendants on the argument. But the defendants say that after the checks had been given and deposited by Kirk in the bank, to the credit of Campbell, matters had progressed so far that the plaintiffs could not disaffirm their contracts; that they were in fact executed. From the foregoing statements of the law it seems however that a contract of this character is executed only when the successful party gets the money in his grasp. There are no equities operating in his favor to give him title short of that. No innocent

third persons are affected by these dealings. The checks never passed beyond the stock gamblers. And as the contracts themselves were utterly void, are not all checks, accounts and papers relating to them void as well?

The Supreme Court of our state said, in Lloyd v. Leisenring, 7 Watts 294, in approving Smith v. Mitchell, 1 Binn. 110, " The doctrine is laid down, that all contracts which have for their object anything which is repugnant to justice or against the general policy of the common law or the provisions of a statute are void; and where a contract or agreement is entered into with a view to violate any of their principles or provisions, there is no form of words, however artfully introduced or admitted, and no evidence of contract which ingenuity can suggest, which will give effect to a contract expressly prohibited or declared null and void."

Harper v. Young, 112 Pa. 419, is a case in which a negotiable note, given in a gambling transaction, was held void though in the hands of an innocent holder for value ; and in the case of Griffith v. Sears, 112 Pa. 523, a bond given by way of margins, for the adjustment of differences in stock gambling, was held void. The same rule was applied to a promissory note given to a broker to satisfy losses arising from stock gambling operations in the case of Gaw v. Bennett, 153 Pa. 247.

" When an instrument is absolutely void in its creation, it cannot be made valid by any subsequent transaction immediately arising out of it. It is not like a security given by an infant, which is only voidable:" Woodson v. Barrett, 3 Am. Dec. 614.

A check given for a gaming consideration was held void in Fuller v. Hutchings, 70 Am. Dec. 746; Williams v. Judy, 44 Am. Dec. 699, and Edgell v. McLaughlin, 6 Wh. 176. See also Cunningham v. Nat. Bk. of Augusta, 51 Am. St. Rep. 266.

How can the checks in this case be held effective to transfer the fund as between parties to the illegal dealings ? That they were void and worth no more than so much blank paper cannot be disputed. And are the book entries in relation to them, made by the bank officials with full knowledge of the character of the transactions, of more value for that purpose?

Jurisdiction of the bill in this case was originally entertained by our predecessor on the bench, and we afterwards refused to dissolve the preliminary injunction granted by him. It has been

strenuously urged that it is not a case for equity jurisdiction, and that if the plaintiffs have a remedy at all it is at law. In the closing lines of the 15th paragraph of the amended bill it is alleged, with an air of ingenuous artlessness, that "the paying over of said money to said Kirk or Campbell by said bank would be a fraud on the said complainants, contrary to law and equity, prejudicial to the interests of the community, against public policy and the rights of the individuals concerned." Better grounds for the intervention of an equity court are, we think, assigned in the 17th paragraph. Besides, in addition to the reasons given by the master for entertaining equity jurisdiction, the fund is insufficient to pay all the depositors in full, as his distribution shows, and if each had brought his suit at law, his pro rata share could not have been arrived at in a separate action. If the plaintiffs are entitled to recover the fund in controversy, we think they are in the right court. "Chancery has jurisdiction to restrain the enforcement of an unexecuted and illegal wager contract:" Patillon v. Hipple, 32 Am. Rep. 31. That was a bill in an Illinois court to restrain a stakeholder from paying over the stakes. Woodson v. Barrett, 3 Am. Dec. 612, supra; Davidson v. Givins, 4 Am. Dec. 695; Clay v. Fry, 6 Am. Dec. 654, were all cases in equity to restrain the collection of paper founded on gaming considerations: 2 Pomeroy's Eq. Juris. section 939, etc.

Having jurisdiction it was the master's duty to determine the whole matter, as he did, by a pro rata distribution of the fund to those who had contributed to it. Entertaining these views, we overrule the exceptions to the report of the master and confirm his report.

*Error assigned* was decree of the court.

*A. A. Stevens* and *L. C. McQuistion*, with them *J. H. Jordan* and *AlexanderKing*, for appellants.—The court should have dissolved the injunction: Machette v. Hodges, 1 Brewster's Rep. 316; Carpenter v. Burden, 2 Parsons' Eq. 27; Dull v. Holl, 1 Phila. 259; McVeagh v. Brindle, 5 Lancaster, 26; Huston v. Huston, 1 W. N. C. 26; Hilliard on Inj. 109, par. 40; Berlew v. Illuminating Co., 1 Pa. C. C. 651; Lutz v. Lutz, 34 P. L. J. 260; Bedford v. Potter, 9 Phila. 560; Hopkinson v. Mor-

timer, 1 W. N. C. 139; 2 Selling on Ex. Remedies, par. 1056; Brewster's Eq. Prac. p. 421.

The injunction was improvidently granted. An injunction will be refused till the court are satisfied that the case before them is of a right about to be destroyed, irreparably injured, or great and lasting injury about to be done: Harkinson's App., 78 Pa. 203; Brown's App., 62 Pa. 17; Kelley v. City, 53 Leg. Int. 234; Minnig's App., 82 Pa. 373; Hoffman's App., 10 W. N. C. 401; McCall v. Barrie, 14 W. N. C. 420.

The claim of plaintiffs is not within the jurisdiction of a court of equity: 1 Story's Eq. p. 315; Ham v. Smith, 87 Pa. 66; 2 Pomeroy's Eq. 454; Patterson's App., 13 W. N. C. 154; Holt v. Green, 73 Pa. 198; 6 Am. & Eng. Ency. of Law, 708; Evans v. Dravo, 24 Pa. 62; 1 Story's Eq. sec. 294; Hershey v. Weiting, 50 Pa. 244; Bredin's App., 92 Pa. 241; 1 Pomeroy's Eq. 343; Allebach v. Hunsicker, 132 Pa. 349; Stewart v. Parnell, 147 Pa. 523; Harbaugh v. Butner, 148 Pa. 274; Merryman v. Stock Ex., 1 Pa. C. C. 478; Smaltz's App., 99 Pa. 132; Hilliard on Injunction, 217; Grey v. Ohio & Penna. R. R. Co., 1 Grant, 412; Richard's App., 57 Pa. 105; Bispham's Eq. (ed. 1882) page 54; Gallagher v. R. R., 38 Pa. 102; Smaltz's App., 99 Pa. 310; Edelman v. Latshaw, 159 Pa. 644; McGowin v. Remington, 12 Pa. 56; Bridesburg Mfg. Co.'s App., 106 Pa. 275; De Zouche v. Garrison, 140 Pa. 430; Dohnert's App., 64 Pa. 311; Bechtel v. Sheafer, 117 Pa. 555.

Kirk was not Campbell's agent: Wharton on Agency, 114; Underwriters Association v. George, 97 Pa. 238; Union Refining Co. v. Bushnell, 88 Pa. 89.

Hartley & Company were not stakeholders for plaintiffs of the money standing to the credit of Campbell in their bank.

*S. P. Wolverton* and *John M. Reynolds,* for appellees.—Campbell's right to these funds cannot accrue on terms different from those made with Kirk: Kelsey v. Nat. Bank of Crawford Co., 69 Pa. 426; Mundorff v. Wickersham, 63 Pa. 89; Stephenson v. Grim, 100 Pa. 73; Jones v. Nat. Building Association, 94 Pa. 215; Sunbury Fire Ins. Co. v. Humble, 100 Pa. 499. Plaintiffs may show for whose actual use the Campbell account was kept: Patterson v. Marine Nat. Bank, 130 Pa. 419; Hemphill v. Yerkes, 132 Pa. 545; Burger v. Burger, 135 Pa. 499.

Deposits were made under terms of the agreement of the depositors, Kirk, and the bank. J. G. Hartley & Co. were stakeholders of these funds : Tarleton v. Boher, 44 Am. Dec. 358 ; Wharton on Contracts, ed. 1882, sec. 352 ; Nace v. Boyer, 30 Pa. 110 ; Alford v. Burk, 68 Am. Dec. 449 ; McKee v. Manice, 11 Cushing, 358 ; Vischer v. Yates, 11 Johns, 23 ; Conklin v. Conway, 18 Pa. 329 ; Forscht v. Green, 53 Pa. 140 ; Hardy v. Hunt, 70 Am. Dec. 787 ; Downs v. Quarles, 12 Am. Dec. 338 ; Clay v. Fry, 6 Am. Dec. 654 ; Moore v. Tripp, 20 N. J. 263 ; Ruchinzky v. De Haven, 97 Pa. 202 ; 8 Am. & Eng. Ency. of Law 899 ; Wharton on Contracts, 641 ; Repplier v. Jacobs, 149 Pa. 167.

The remedy is in equity: Harrisburg Nat. Bank v. Hiester, 2 Pierson, 256 ; Adams v. Beach, 1 Phila. 99 ; Wharton on Contracts, sec. 454 ; Aycinena v. Peries, 6 W. & S. 243 ; Harper's App., 109 Pa. 9 ; Bitting's App., 105 Pa. 517 ; Electric Co.'s App., 114 Pa. 574 ; Wesley Church v. Moore, 10 Pa. 280 ; Kirkpatrick v. McDonald, 11 Pa. 393 ; Yard v. Patton, 13 Pa. 282 ; Socher's App., 104 Pa. 615 ; Riegel v. Am. Life Ins. Co., 153 Pa. 147.

OPINION BY MR. JUSTICE GREEN, October 6, 1896 :

The controversy in this case is over a fund in the hands of J. G. Hartley & Co., one of the defendants. The money in their possession is claimed by J. M. Campbell, another defendant who is the appellant, and it is also claimed by the plaintiffs. Hartley & Co. make no claim to it whatever, and so far as the contending claimants are concerned they are mere stakeholders. This fact has been found by the master and the finding has been confirmed by the court and is in entire accord with the whole of the testimony. There are certain fundamental facts which are altogether without question, and which must be regarded as established facts in the case. One is that Campbell never placed a dollar of the money with Hartley & Co. Another is that the present plaintiffs actually furnished the whole of the money in dispute and considerably more besides. In point of fact the money was deposited with Hartley & Co. by George W. Kirk, but Kirk received the whole of it from the plaintiffs. It was deposited under an arrangement made between the plaintiffs and Kirk, who was a broker in stocks and grain, but who

was totally irresponsible, and it was deposited in the name of Campbell, not because it was Campbell's money, but in order that it might be used as margins upon transactions in the purchase and sale of stocks and bonds, in a purely speculative manner, and not with any intention to make actual purchases and deliveries of the stocks and grain dealt in. It was expressly agreed that the money deposited to the credit of the account called " J. M. Campbell " should not be drawn out on checks of J. M. Campbell without the consent of the plaintiffs. It was well said in the opinion of the learned court below that, " From Campbell and Kirk, down to the last customer, they did not pretend to own a dollar's worth of commodities in which they assumed to be dealing. Nothing was actually bought or sold in Bedford or elsewhere, but it was a mere matter of wagers, of bookkeeping and the adjustment of balances. The master finds in answer to the plaintiffs' request, that Campbell 'acknowledged that he took the trades himself and did nothing towards investing the funds he received in the articles which were supposed to be bought and sold.' The business was therefore all confined to the little circle made up of Campbell, Kirk and their customers at Bedford." Turning to Campbell's testimony we find he said, " I was receiving from different people ; some would buy, some sell. Now all that I needed to go into the market to buy from any brother broker would be the difference between buying and selling. Q. You didn't trouble your mind about any purchase ? A. I never bought anything directly in the exchange unless they wanted the stock. Q. You understood these transactions here were simply transactions on the differences ? A. I presume they were."

The case then substantially presents in its leading and dominating features, a deposit of money by the plaintiffs with third persons who are stakeholders, for the purpose of being used as margins in the mere purchase and sale by the defendant, Campbell, of differences in the market prices of stocks and grain, without any actual purchases or sales of stocks or grain in specie. Under all our decisions these are mere wagering contracts and are illegitimate transactions, and the money being still in the hands of the stakeholder and not paid over to the person who made, or who claimed to have made, the transactions, the question is, can money deposited for such uses but not actually paid

over be recovered back. Upon that question the authorities cited in the report of the master, the opinion of the court below and the argument for the appellant, are most full and conclusive, and they are very numerous. In fact they are not controverted. A very brief reference only will be necessary.

In the note to Godsall v. Boldero, 2 Smith's Leading Cases, 8th ed. part 1, p. 319, the doctrine is thus stated: " But it is held in general that so long as the money, staked on the result of a wager, remains in the hands of the stakeholder, it belongs to the person from whom it came, and may be withdrawn by him, notwithstanding the loss of the bet and without the consent of the other party to the contract. . . . A notice not to pay will operate as a countermand of the authority implied by the original deposit, and a subsequent payment will be no defense to an action for money had and received."

In McAllister v. Hoffman, 16 S. & R. 147, we held that money bet upon an election and deposited with a stakeholder, who, after the event of the election is known, has notice not to pay it over to the winner, may be recovered back by the loser. Said GIBSON, C. J., " The result of the authorities undoubtedly is that the loser may withdraw his stake at any time before actual payment to the winner." In Conklin v. Conway, 18 Pa. 329, we held the same doctrine. An action lies against a stakeholder for money deposited by plaintiff with him on a bet, and which the stakeholder has not paid over, or which he has paid to the other party after demand by plaintiff and notice of withdrawal of the bet, or that it had failed through a dispute as to the mode of its decision. To the same effect is the case of Forscht v. Green, 53 Pa. 138.

In Harper v. Young, 112 Pa. 419, we applied the same principle to a case in which the defendant gave a note to pay money lost by another at play, although the note was in the hands of an innocent holder for value. A fraud was also practiced upon the defendant, to induce him to give the note, but we held that the gambling character of the transaction still remained, and avoided the note. In a per curiam opinion, we said, " The undoubted evidence proves the note in contention was given in a gambling transaction. The fact that a fraudulent device was superadded to induce the giving of the note, did not destroy the gambling nature of the scheme. The note was made payable to the order

of the person who won the money in gambling, and in payment of the debt thereby incurred. . . . The foundation of the transaction and also the consideration of the note, both rested on the one gambling operation. Such being the case, and although the note is negotiable in form, it is void even in the hands of a good faith and innocent holder for value."

In Gaw v. Bennett, 153 Pa. 247, we went one step further, and applied the same rule to a note given to a stock broker by a customer, for whom he had bought and sold stocks at various times, resulting in a loss, for the amount of which the customer gave his promissory note. The present chief justice delivering the opinion after commenting upon the evidence and the function of the jury in connection therewith, said, " On the contrary we think the testimony tended to prove that the intention of both parties was merely to wager upon the prospective price of said stocks, settle the difference and pay the gain or loss; in other words their transactions throughout, were in fact repeated acts of gambling in the stocks referred to in said accounts, and the jury were warranted by the evidence in so finding. . . . In this state the law relating to gambling contracts has been finally settled in a long line of cases, among which are the following," citing a large number of cases. No difference is made in these cases between those in which the wager was void under the statutes against horse racing and gaming, and those which resulted from wagering stock transactions. Fareira v. Gabell, 89 Pa. 89, was one of the latter kind, and that case is thus referred to in the further course of the opinion above cited: " Also that notes given to a broker to cover losses in stock·gambling operations are void; that money advanced by a broker to pay such losses cannot be recovered, nor can the broker's commissions be recovered, because the whole transaction is unlawful."

Griffiths v. Sears, 112 Pa. 523, was another instance of the same kind. We there held that a bond, given by way of margin to secure a settlement of differences in a stock gambling transaction, is void for want of a good and legal consideration.

It is not necessary to multiply the references. They are all in the same direction. If then, actual obligations founded upon the settlement of real transactions in the stock market, which have resulted in loss, where the dealing was upon the basis of margins for speculative operations, are void, how much stronger

is the present case where a mere deposit of money was made with a stakeholder, and it has not been paid over, and where, also, there never were any real transactions of purchase and sale, but only a dealing in differences.

We are very clearly of opinion both upon principle and authority, that the moneys deposited with Hartley & Co. were within the control of the plaintiffs at any time before they were paid over to Campbell, and therefore they can be recovered in this proceeding.

Some minor questions are raised in the paper-book, the principal one being the question of jurisdiction. We have no doubt upon that subject. · The money deposited with Hartley, though coming from several different persons was entered in one joint account called "J. M. Campbell." A number of transactions were made and a considerable part of the money deposited was paid out. The contest is over the resulting balance, but in order that the balance could be ascertained the accounts would have to be adjusted, and the balance struck. But that could not be done in a separate common law action by each depositor. There could be no adequate remedy except by making all the persons interested parties to the proceeding, and having the accounts adjusted so that the rights of each one could be determined, and as to that each depositor would be entitled to be heard, not only as against Campbell and against Hartley & Co., but as to each other. The accounts are also mutual, representing numerous items of deposit on the one side, and still more numerous transactions on the other. On the ground therefore of inadequacy of the legal remedy, and of mutual accounts, and community of interest in a joint fund which requires an ascertainment and division into several separate interests, and the prevention of a multiplicity of suits, the jurisdiction of equity is undoubted. The fourth head of equity jurisdiction under the act of 1836 is, "The determination of rights to property or money claimed by two or more persons, in the hands or possession of a person claiming no right of property therein." While this source of jurisdiction is generally exercised by a bill of interpleader that remedy is not exclusive, and we know of no reason why the jurisdiction undoubtedly conferred by the act should not be exercised under another bill which is more adapted

to all the facts of the case.    Injunction and discovery were also needed for the purposes of an adequate remedy.

. The other questions raised are without merit and do not need discussion.   We are of opinion that the decree of the learned court below was entirely correct and that it should be affirmed. The assignments of error are all dismissed.

Decree affirmed and appeal dismissed at the cost of the appellant.