Carey v. Myers.

---

No. 18,634.

R. E. CAREY et al., Partners, etc., *Appellees*, v. T. J. MYERS, *Appellant*.

SYLLABUS BY THE COURT.

1. DEALER IN "FUTURES"—"*Bucket Shops*"—*Wagers on Future Prices of Pork—Gambling*. The statutes (Gen. Stat. 1909, §§ 5167-5176) prohibit the pretended purchase and sale of grain, pork, and other commodities upon market quotations where it is not intended that the article shall be received or delivered, the person so agreeing to sell or deliver not being in possession or control of it. The statute condemns the keeping of any office or place wherein the keeper, in his own behalf or for others, makes or offers to make contracts or transactions for the purchase or sale of such commodities where the parties do not contemplate or intend the actual *bona fide* receipt or delivery of the property, but do intend a settlement based upon the differences in the price at which it is, or is claimed, to be bought and sold. All pretended purchases, sales or agreements made in violation of the statute are declared to be gambling and criminal acts.

2. SAME—*No Recovery of Losses or Gains Resulting from Gambling Contracts*. In May, 1909, the plaintiffs by telephone placed orders for 2000 barrels of pork for September delivery with the defendant, who was carrying on the business pro-

Carey v. Myers.

hibited by the statute. The order was accepted by the defendant and margins of $400 were called for and remitted. In July following the plaintiffs ordered a sale to be made; and thereupon the transaction was closed out at a profit upon the difference in the market price at the time of opening and closing the deal. No pork was in fact bought, sold or delivered, and deliveries were not intended. The defendant reported a profit on the deal and paid a part of it. In this action to recover the balance it is held (1) that the transaction was a gambling transaction condemned by the statute; and (2) the plaintiffs and the defendant were mutually engaged as parties in the prohibited deal, and the court will not lend its aid for the recovery of gains or losses, but will leave the parties in the situation in which it finds them.

Appeal from Shawnee district court, division No. 2; GEORGE H. WHITCOMB, judge. Opinion filed June 6, 1914. Reversed.

*Eugene S. Quinton,* of Topeka, for the appellant.

*Bennett R. Wheeler,* and *John F. Switzer,* both of Topeka, for the appellees.

The opinion of the court was delivered by

BENSON, J.: The petition alleges:

"That on the 22nd day of July, 1909, the said T. J. Myers, as the duly authorized agent of said plaintiffs, sold for the said plaintiffs two thousand barrels of pork at $21.05 a barrel, and the said T. J. Myers failed to remit the said plaintiffs the sum of $772.50 thereon."

The answer contained a general denial and a special verified denial of agency.

A demurrer to the evidence of the plaintiffs was overruled. The defendant offered no evidence, and judgment was rendered for the plaintiffs for $772.50, the amount claimed, with interest. The defendant appeals.

The defendant contends that there was in fact no purchase or sale of pork; and that the transaction was a mere gambling speculation—a wager upon the rise and fall of market prices, denounced as criminal by statute.

The plaintiffs are farmers in Lyon county and the defendant is a broker in Topeka. On May 12, 1909, the plaintiffs sent an order to the defendant by tele- phone through a branch office in Reading for the purchase of 1000 barrels of pork, and on May 18 they sent in a like order for another 1000 barrels, all for September delivery. Notifications were received through the Reading office that these orders were filled at $18.15 and $18.40 per barrel, respectively. Margins of $200 on each order were called for by the defendant and remitted to him through the same office. About July 15, the plaintiffs, by telephone to Mr. Cross, the Reading agent, ordered the 2000 barrels of pork sold at the market price of $21.05 per barrel. Soon after, a report of such sale was received from the defendant, and on July 22 he sent a check, to the order of Mr. Cross, to cover the amount due to several parties in the vicinity, on like deals, including $5077.50 for the plaintiffs, which amount they received, leaving $772.50 of the profits which the defendants accounted for by crediting the amount to Mr. Cross. It appears that the Reading agency owed the defendant that amount on a settle- men of commissions and margins in this and other like deals. Although the defendant insists that Mr. Cross was not his agent, the evidence seems to estab- lish that fact, but it may not be necessary to the decision of this case to precisely determine the relation between the defendant and Cross. The testimony of the plain- tiffs shows that they had been engaged in deals in pork, corn and wheat for some time. They could not state the number of transactions or whether there were as many as twenty-five deals in a year. In all these deals, except one in corn, there was no delivery made to or by the plaintiffs. In the corn deal the only delivery was by warehouse receipt, and a sale was made with- out removing the corn from the elevator in Kansas City. The telephone orders received from time to time by Mr. Cross were transmitted to the defendant.

by private wire. Each deal was designated by a number in the defendant's office and margins received were credited upon the number to which they applied, but they were not credited to the particular persons who sent them in. Accounts of remittances and of commissions were kept with the Reading office, and daily settlements were made and commissions divided with that agency.

It appears from all the evidence that there was no pork either bought, sold, or delivered in the transactions under consideration and no deliveries were intended. The business was all done on margins, put up as the market fluctuated. The amount included in the check, before referred to, for the plaintiffs, plus the balance sued for, was the difference between the price when the transaction was booked and the price when it was closed. Thus the plaintiffs staked $400 on an advance in the market, expecting to gain the amount of such advance or more, and willing to lose that sum and any amount additional they might put up afterwards if the market should fall. This method of gambling in commodities has met with general judicial condemnation, and independently of special prohibitory statutes forbidding it courts have refused their aid to either party. Such transactions are very clearly described in Legislation against Speculation and Gambling in the Forms of Trade, by T. Henry Dewey, as follows:

"Gambling on prices is betting on the rise or fall in market prices by means of pretended purchases and sales or pretended employment as a broker or commission merchant to make pretended purchases and sales. In other words, it is using the forms of buying or selling, or the forms of employment to buy and sell, where no real buying or selling or real employment is contemplated, the parties agreeing to settle with each other by the mere payment of differences between the prices of pretended purchases and pretended sales. . . . The usual implements of gambling on prices are a black-board, upon which are posted from time to time

Carey v. Myers.

the market prices of stocks, cotton and other produce, slips of paper purporting to be orders to the keeper of the place to buy or sell for the account of the other party and other slips of paper purporting to be notices of purchases or sales made by the keeper of the place for the account of the other party.  Each transaction is settled by the payment of the difference between the price of a pretended purchase and the price of a pretended sale, it being agreed or understood that no delivery of the things pretended to have been bought and sold is ever to be made.  A deposit is required by the keeper of the place which is called a margin, but is really security to him for the payment of the wager. If the market goes in his favor, he closes the transaction as soon as the fluctuation in price equals the amount of the deposit, which he then keeps; or it may be closed by the other party at any time before the loss to him equals the amount of the deposit.  If the market goes in favor of the other party, the transaction is closed whenever he gives an order for that purpose, and then the keeper of the place pays to him the difference between the market prices of the pretended purchase and sale and returns the deposit.  A place in which such pretended dealing is carried on is called a 'bucket-shop.' "    (pp. 5, 6.)

Some of the testimony shown by the abstract is as follows.  Mr. Cross testified:

"Mr. Myers had a telephone wire in my office in the back room.  When Carey Brothers or anybody wanted to place an order for pork, wheat or corn, they would call me up.  When they wanted to buy or sell any pork they telephoned it in to me.  . . .  I would make a memorandum of the telephone order.  I have not got that memorandum; threw them away after they were O. K'd and the day's business was over with.  . . . The order usually read, buy or sell so and so, with the number, say 500 of pork, K. G. Carey Brothers.  . . . I would number each order.  . . .  There were lots of other dealers.  They made a lot of deals every day. If it was wheat they bought, it was one per cent per bushel, they would put up as margins; if they bought pork it was two and a half or five cents a barrel they put up.  . . .  It was all done on the margin basis.

32—92 KAN.

There was no sale of any stock, pork, wheat or corn in any of these deals. When a man dealt with me, either buying or selling, I would take down his deal, charge him a margin on it and he paid the money to me, that is the margin, and I would remit the deal to Mr. Myers at Topeka, and Mr. Myers would receipt to me for the order that would come to me. . . . If this pork had been bought on the 12th day of May and the pork went down next morning Mr. Myers would call on me for an additional five cents, and I would have to put it up. . . . If pork went down three cents he would call on me for margins, so much per thousand barrels. . . . If the margin was not put up the deal was closed out. . . . Mr. Myers made his statement to me of the amount of margins each day, and just how my margins stood, and if I was shy he would call on me for it. He would make a settlement or statement every day. . . . The second deal with Carey Brothers was transacted in exactly the same way. . . . They had other deals, I could not say how many others; they had a good many. . . . Whenever Mr. Myers would remit me Saturday night he remitted me more money than the amount of Mr. Carey's deals. He would remit me the amount of commissions I had earned during the week and the statement included, Carey's deals, Jones' deals and Brown's deals. . . . The checks averaged weekly all the way from thirty dollars up to ten thousand dollars, and they represented the closing of transactions between me and Myers."

The plaintiff R. E. Carey testified:

"I had a conversation with Myers concerning the establishing of an office in Reading, Kansas. I met Mr. Myers at our farm. Our conversation was in regard to establishing a branch office at Reading. Said he came to solicit our business. . . . Mr. Myers said, you would not have to trust him (Cross). The business is done through me. . . . I dealt in margins right along. Before the time for delivery I disposed of it, if there was a profit in it, and in all these transactions I simply put up a margin whenever it was needed, as I was called on for it. As the market went down I would be called on for additional margins. . . . I frequently put up margins and when the market got right I would sell and take down the profits.

. . . When I ordered this pork I telephoned the order to Mr. Cross. . . . He asked for $200.00 margin. . . . I sent him a check for $200. I keep my checks for receipts. . . . He told me over the 'phone my order was filled and gave me a number. . . . I was never called on for a re-margin on those purchases. From those two purchases I received $5077.50, upon which I had placed only a margin of $400.00. The pork never was delivered to me. . . . I don't remember whether in the deals we had during that year my brother and I received the sum of eighteen or twenty thousand dollars from Mr. Cross."

The defendant testified:

"I could not figure out how much Carey Brothers had deposited as margin. I have no record in books as to the amount of margins put up or how much margin was put up. I never knew how much margins anybody at the Reading office put up. . . . I did not know how much margin every man put up, but I knew how much each number put up. I knew how much margin every number brought, certainly, and made it a matter of record in my office, and I knew how much margin was on Nos. 613 and 632. . . . Mr. Cross made a lot of trades in pork, but I don't remember any particular order, when they were made or whom they were made for. . . . Had no way of making an investigation. The records had all been destroyed. I saw Mr. Carey once. I don't know that I ever threatened Mr. Carey with closing out his deals and taking the losses the other parties at Reading out of those pork deals. I threatened Mr. Cross, not Mr. Carey, that I was going to close his trade. . . . Mr. Cross had told me they were Carey's deals. Mr. Cross told me he had some pork deals booked with other people down there, had lots of other deals. We closed them all out. . . . The orders were by number. There would be several others come along together all by number. . . . When an order came in saying buy one thousand barrels of pork as testified to here, signed E. M. Cross, that order was put to E. M. Cross, credited to his account, and all other orders that came in the same day were credited the same way and a statement sent each day showing just how many orders purchasing or buying or closing out of that day to E. M. Cross each and every day, and those statements

showed exactly the transactions for the day, the money received, the money remitted to him less the commission that I would be entitled to in placing those orders. . . . I never sold or disposed of two thousand barrels of pork for Mr. Carey or Carey Brothers. I never had two thousand barrels of pork in my possession nor under my control for Carey or Carey Brothers."

The statutes relating to this subject in force when the orders were placed provided:

"Every person who shall buy, sell, exchange, or in any other manner deal in grain, stocks, bonds, securities, provisions, or any other commodities whatsoever, upon telegraphic or telephone market reports and quotations, it not then being the intention of such person, in pursuance of such purchase, sale or exchange, to receive or deliver such grain, stocks, bonds, securities, provisions, or other commodities, and the said person selling or agreeing to sell not then being in the possession and control of such grain, stocks, bonds, securities, provisions, or other commodities, shall on conviction be adjudged guilty of a misdemeanor, and shall be punished by a fine of not less than one hundred dollars nor more than five hundred dollars, and by imprisonment in the county jail not less than thirty days nor more than six months." (Laws 1899, ch. 77, § 1, Gen. Stat. 1909, § 5167.)

The act also defined and prohibited the keeping of "bucket shops," where telegraphic or telephone market reports or quotations upon the commodities referred to were received or made public by blackboards or any other manner, where persons resorted for the purpose of buying, selling, exchanging or dealing in such commodities, where such persons did not intend to receive or deliver and were not in possession and control of the same. The places referred to were declared to be nuisances, and violations of the statute were declared to be misdemeanors subjecting the offender to fine and imprisonment. By chapter 121 of the Laws of 1909, which took effect May 29, 1909, the act of 1899 was amended and new sections were added, but the section

Carey v. Myers.

above quoted remained unchanged. Section 2 of the act of 1909 contains the following:

"All pretended purchases and sales or contracts and agreements for the pretended purchase and sale of the commodities aforesaid, in manner aforesaid, wherein there is, in fact, no actual purchase and sale or sale and purchase of such commodities for or on account of the party or parties thereto, are hereby declared gambling and criminal acts, whether the order or contract for the pretended purchase or sale of such property purports to be offered, accepted, executed or consummated in this state or in any other state or country: *Provided*, The offer to make such pretended purchase or sale of said property is placed or given or communicated from this state; and any person violating the provisions of this section shall be guilty of a felony." (Gen. Stat. 1909, § 5169.)

It will be seen that the section first copied was in force during the time covered by the transactions under consideration here, but the section last copied did not take effect until a few days after they were commenced. The statutes remaining in force are sections 5167 to 5176, inclusive, of the General Statutes of 1909.

The plaintiffs deny that the deal was in violation of law or public policy, but earnestly contend that if it was they may still recover the profits of the game on the ground that it was closed and the money was in the hands of their agent, which he can not withhold merely because it came to him through an illegal transaction. (*Floyd v. Patterson*, 72 Tex. 202, 10 S. W. 526, 13 Am. St. Rep. 787.) Decisions supporting this proposition rest upon the principle that money may be recovered from one who receives it, by one for whose benefit it was paid, if such recovery does not involve the enforcement of an illegal contract. (*Willson v. Owen*, 30 Mich. 474.) Money deposited with a third person under an arrangement with a broker, to be used as margins in deals of this nature, may be recovered by the customer before it is so used, it being con-

sidered as in the hands of a stakeholder. (*Dauler et al. v. Hartley et al.,* 178 Pa. St. 23, 35 Atl. 857.) An agent entrusted with money to purchase property at a judicial sale under an illegal agreement to suppress competition can not withhold a surplus after the agreement is fully executed. (*Hardy v. Jones,* 63 Kan. 8, 64 Pac. 969, 88 Am. St. Rep. 223.) The same rule was followed in *Ware v. Spinney,* 76 Kan. 289, 91 Pac. 787, 13 L. R. A., n. s., 267, where it was said that parties seeing the error of their ways are given an opportunity to repent and rescind. The question is whether the principle of these and similar cases is applicable where the transaction is entirely between the broker and the customer, where no purchases or sales are in fact made, and there is only a settlement of differences in the market price between the dates of opening and closing the transaction. In a similar transaction in Pennsylvania, one Ruchizky dealt in stocks on margins with De Haven & Townsend, brokers. An action was brought to recover the margins. In the opinion it was said:

"When, under the case stated, the court below assumed the defendants must be regarded as the agents of Ruchizky in the buying and selling of stocks, in other words, as the mere hand or medium through which he acted in transactions with other parties, it committed an error. An assumption of this kind is in the very face of the statement before us; the parties were dealing, not in stocks, but margins, and Ruchizky knew no principals but De Haven & Townsend. It was with them and no one else he was dealing, and with them alone he had to account." (*Ruchizky v. De Haven,* 97 Pa. St. 202, 209.)

While that opinion has been criticised in respect to its interpretation of the facts, the quotation is made to show that the proposition that a recovery of profits in the hands of the broker, where the transaction is a gambling one, on the ground that he holds it as agent, is not adopted in Pennsylvania. In *Pearce v. Foote,*

Carey v. Myers.

113 Ill. 228, involving option deals, the court, after referring to the statute declaring such deals unlawful, said:

"The suggestion that Hooker & Co. merely acted as the agents for plaintiff in these unlawful transactions may be rejected at once as having nothing in its support. There is and can be no such thing as agency in the perpetration of crimes or misdemeanors, or, indeed, in the doing of any unlawful act. All persons actively participating are principals. Treating all the parties engaged as principals, it is immaterial to which one the money or property lost was in fact paid or delivered—whether to Hooker & Co., or to any of the parties on the board of trade with whom they may have made fictitious contracts and lost,—and paying to either principal is, in law, paying to the 'winner.' " (p. 238.)

In *Norton v. Blinn,* 39 Ohio St. 145, although a recovery of money accruing from a similar illegal transaction was allowed, it was said:

"In offenses against trade, and the like, the law regulating the administration of penal justice, does not recognize the relation of principal and agent, unless the agent be an innocent instrument merely. In such cases the guilty offenders against the law are all principals; hence, as between such, with some show of reason, it might be said that the law will afford no redress by civil remedies." (p. 149.)

In *Lester v. Buel et al.,* 49 Ohio St. 240, 30 N. E. 821, 34 Am. St. Rep. 556, the claim that the broker in such a transaction is the agent of the party who gives the order and puts up the margins is repudiated. The court said:

"If these purchases and sales of grain were in fact wagers on the future price of the grain ostensibly dealt in, then it is clear that the relation of principal and agent did not exist between the defendants and the plaintiff, and, that they were such, was found by the verdict of the jury under proper instructions from the court. . . . The assumption of the plaintiff that he was buying or selling wheat for the defendants, was a mere disguise adopted for the purpose of concealing the nature of the real transaction; and, as it had no founda-

tion in fact, the agency based upon it is alike a mere assumption and had no real existence." (p. 254.)

The discussion of this question in the case last cited appears to meet the argument based upon the agency of a broker in such cases, holding to the rule that the parties are *particeps criminis*. (See, also, Note, 13 L. R. A., n. s., 267.)

A multitude of cases hold that a broker in transactions of this nature can not recover for losses. One of the more recent cases is that of *Anderson v. Holbrook,* 128 Ga. 233, 57 S. E. 500, where it was said:

"If the broker is a privy to the wagering contract, and brings the parties together for the very purpose of entering into the illegal agreement, and advances money for margins in furtherance of the transaction, he can not recover it." (p. 239.)

A concise statement of the same rule, with references to many decisions supporting it, will be found in a note appended to the report of the same case in 11 L. R. A., n. s., 575.

The same principle was declared in *Irwin v. Williar,* 110 U. S. 499.

Although in these cases the broker sought to recover from the supposed principal, decisions are not wanting applying the same rule against the broker in actions for profits. It was held in *Clarke, Harrison & Company v. Brown,* 77 Ga. 606, 4 Am. St. Rep. 98, that the profit on futures in grain can not be recovered from an agent who won it for his principal with the use of the latter's money on the illegal venture. That, however, was an action to recover of the principal money deposited with the agent, and a recovery was allowed. But the court said:

"If it had been won as profits on the venture, it could not have been recovered back from agents, who got it for the principal with the use of the principal's money on the illegal venture, because that would be money recovered on a chance venture, and considered by this court as equivalent to a gambling venture. . . . The

Carey v. Myers.

agents can not set up the illegal contract, because they made it, and got a consideration for using the money illegally, and are *particeps criminis*. Just as if it had been necessary for the plaintiff—the principal—to use the illegal contract to recover the money, which would have been necessary had he sued for the profits of the venture; so it is illegal for the agents to use it to defend the suit for money they have belonging to the principal." (pp. 609, 610.)

A broker in Boston received an order to buy wheat, accompanied by the deposit of a margin, and bought "deliverable seller's option" two months later. The customer ordered a sale, which was made at a profit, and the broker sent a statement of the account, showing the balance due. In an action against the broker for this balance, a defense was made on the ground that the deal involved a gambling transaction, and therefore was void. The defendants offered evidence tending to prove that the purchase and sale were merely formal, constituting a wager on the price of wheat, to be determined by the difference in quotations at the time of the pretended purchase and sale, and the court found in their favor. On appeal it was held that the trial court did not err in refusing an instruction that the brokers were agents, and as such were not entitled to set up the transaction by which the money came into their hands. The court said in the opinion that the defendants, the brokers, were principals in dealing with the defendants (the customers). (*Wakefield v. Farnum*, 170 Mass. 422, 49 N. E. 640.) While the opinion is quite brief, it appears to refute the contention of the plaintiffs in this case that the defendant can not maintain a defense based on the illegality of the transaction.

In the opinion in *Peters et al., Appellants, v. Grim,* 149 Pa. St. 163, 24 Atl. 192, 34 Am. St. Rep. 599, affirming the general rule that a purchase and sale of stock on margins, when there is to be no delivery, is a gambling transaction, earlier Pennsylvania cases on that

subject are criticised, but the court said that in this class of cases the decisions had only gone so far as to sustain the opening of the whole transaction after it had nominally closed, where the demand is for a part of the actual gains or losses of the illegal acts, thus placing the recovery of gains and losses, as the case may be, upon the same footing.

In *Kahn, Jr., v. Walton et al.*, 46 Ohio St. 195, 20 N. E. 203, the general subject is thoroughly considered, citing many decisions holding that in such cases the broker is *particeps criminis* and can not recover for advances or losses; that checks given to him for forwarding the unlawful undertaking are tainted with the vice of their origin; and that the transaction was void under the statute and upon principles of public policy. The court said:

"In contracts of the kind now under consideration, we have held that they are inoperative and void, as contrary to good morals and positive enactment, and that as such, they are not fit subjects for the action of a court; it is true that in all the cases we have heretofore had, the attempt has been to enforce them; but we can see no difference in the position of the winner and loser, so far as to their right in becoming active movers upon such contracts in the courts." (p. 209.)

A majority of the court in that case held that the plaintiff, who prayed for cancellation of the checks and an injunction to prevent their payment, should have no relief, because he traced his cause of action through the illegal transaction, which he was obliged to prove as a basis for the relief sought. The court applied the rule that in such a case equity left the parties where it found them. A minority of the court dissented only from the conclusion denying relief, and strongly insisted that the checks should be canceled.

The underlying principle which we believe to be applicable to this controversy is, that no action can be maintained on a contract the consideration of which is

either wicked in itself or prohibited by law. (*Armstrong v. Toler*, 24 U. S. [11 Wheat.] 258, 271.) Courts will not aid in the enforcement of such a contract. To compel one party to render to the other the service or payment stipulated in the corrupt bargain is to enforce it. As we have seen, the authorities are overwhelming to the point that the broker can not compel the payment of losses. On the same principle, the patron or customer can not compel payment of the gains.

In *Alexander v. Barker*, 64 Kan. 396, 67 Pac. 829, it was held:

"One of two parties to an illegal contract, who receives profits through the execution of it, will not be compelled to account to the other, because to require him to do so would be the enforcement of the illegal agreement." (Syl. ¶ 3.)

A like decision was made in *Hinnen v. Newman*, 35 Kan. 709, 12 Pac. 144.

Referring again to the opinion in *Norton v. Blinn*, 39 Ohio St. 145, cited above on the proposition that in transactions of the nature under consideration the relation of principal and agent is not recognized, it should be stated that the court, notwithstanding its emphatic declaration upon that point, decided that a recovery of profits made in the illegal transaction should be allowed against the broker. Following the part of the opinion already quoted the court said:

"The rulings upon this question, however, have been so uniformly the other way, it becomes our duty to follow them, unless we find them totally repugnant to public policy and morality. Upon a careful examination of the authorities, we find no such repugnancy— indeed they commend themselves to our judgment." (p. 149.)

Although the facts of that case differ in some respects from those appearing here, yet conceding that it is an authority of great weight in support of the plaintiffs' claim, it still undermines a highly important

ground upon which their claim rests, and in our opinion its conclusion should not be followed in this case.

The petition alleged, as we have seen, a sale of pork by an agent and that a balance of the money received remained in his hands. The only evidence was produced by the plaintiffs, and it failed to prove a transaction as alleged. On the contrary, it showed a gambling deal. The plaintiffs traced the money which they sought to recover through an illegal transaction, condemned by the statute. The defendants received no pork when the deal was commenced nor afterwards, and did not intend to receive any, as their entire course of dealing and all the evidence shows. Having received no pork, they had none to sell or deliver. When the transaction was closed out, they still had no pork to deliver, and it is not claimed that they intended to go into the market and procure it. It is true that one of the plaintiffs testified that the defendant put out rules written over the market quotations on the blackboard in the Reading office that "in buying, actual delivery was contemplated." Following this statement the counter-abstract shows these questions and answers:

"Q. Did you have any other idea in your mind at the time you gave the order? A. I did n't. I was prepared to handle them.

"Q. When was that pork, according to your orders, to be delivered? A. In September.

"Q. You may state to the court about your being able to take that pork if it was delivered to you. A. I was ready to take it and handle it in any way I seen fit, and market it to the best advantage."

What the witness meant by "taking and handling the pork," as plainly appears from the course of dealing and all the evidence, was to close it out on the differences in market quotations; to his profit if the market advanced; to the loss of his margins if it receded. This accords with all his testimony, a part of which is quoted above. It is impossible to find otherwise upon the evi-

Carey v. Myers.

dence. The legend above the blackboard was unnecessary if transactions were legal. Besides, Mr. Cross, who was in charge of the blackboard and received the order, testified, "I never delivered any pork to Mr. Carey and never intended to. It was all done on the margin basis. There was no sale of any stock, pork, wheat or corn in any of these deals." We conclude from the undisputed facts of this case, as shown by the evidence, that the transaction out of which the balance claimed by the plaintiffs was evolved is in plain violation of the statute.

No parties appear in this transaction except the plaintiffs, the defendant, and Mr. Cross, through whom the orders were given and the margins paid, and who may be dropped out of sight in determining the rights and liabilities of the parties in this action. The parties mutually engaged in an illegal deal, condemned by public policy and by the statute. Each hoped to gain by the transaction. The defendant, we must suppose, did gain at least by the amount of commissions received. The plaintiffs gained over $5000 by their wager, actually paid, and would gain in addition the balance sued for if the court could enforce the illegal venture. Upon well-settled principles of equity it will not assist either party to compel the other to keep his promise. The following language in the syllabus of *Setter v. Alvey,* 15 Kan. 157, is deemed pertinent:

"Where both parties to a contract void as against public policy are equally at fault, the law will leave them where it finds them. If the contract be still executory, it will not enforce it, nor award damages for its breach. If already executed, it will not restore the price paid nor the property delivered."

A promissory note made in renewal of another given to cover margins in a gambling transaction in grain prohibited by the statute in question is void between the parties. (*Hutchins v. Stanley,* 88 Kan. 739, 129 Pac. 1180.)

(See, also, *Washer v. Bond*, 40 Kan. 84, 19 Pac. 323, and *Dolson v. Hope*, 7 Kan. 161, syl. ¶ 3.)

The judgment is reversed and the cause remanded with directions to sustain the demurrer to the evidence.