No. 19,094.

THE STAFFORD COUNTY GRAIN COMPANY, *Appellant,* v. THE ROCK MILLING AND ELEVATOR COMPANY, *Appellee.*

SYLLABUS BY THE COURT.

1. "DEALING IN FUTURES"—*Contracts—When Lawful—When Unlawful.* A contract for the sale and delivery of a commodity at a future time where there is a *bona fide* intention to fulfill the contract and to deliver and receive the commodity is valid, but if the sale is a mere pretense, a wager on the rise and fall of market prices, and there is no intention to receive or deliver the commodity, the contract is contrary to public policy and a violation of the statute.

2. SAME—*Courts Closely Scrutinize Transactions.* Courts closely scrutinize the contested transactions of those who deal in futures and look beyond the form of the agreement to determine whether it evidences a real purchase and sale which has been made with an intention to deliver and receive the commodity and not as a cover for a gambling transaction.

3. SAME—*Evidence—Shows "Dealings" Were Gambling Transactions.* In this case it is held that evidence was introduced tending to support the claim of the plaintiff that the dealings in question were gambling transactions and that the defendant participated in them and was acquainted with their character.

Appeal from Reno district court; FRANK F. PRIGG, judge. Opinion filed March 6, 1915. Reversed.

*W. G. Fairchild, H. S. Lewis, F. L. Martin,* and *Van M. Martin,* all of Hutchinson, for the appellant.

*J. S. Simmons,* and *K. K. Simmons,* both of Hutchinson, for the appellee.

The opinion of the court was delivered by

JOHNSTON, C. J.: The Stafford County Grain Company brought this action to recover $1989, the price of two carloads of wheat, from the Rock Milling and Elevator Company, of Hutchinson, Kan. The wheat was sold by plaintiff to defendant, one car on June 29, 1910, and the other on September 12 of the same year. The purchase and receipt of the wheat is admitted by the defendant, and there is no dispute either as to the quantity of wheat or the price to be paid for it, but the defendant insists that full payment of the price had been made in the manner directed by an agent of the plaintiff who at least had apparent authority to give directions as to the manner of payment. The plaintiff was a coöperative company of farmers incorporated for the purpose of marketing the grain grown by themselves, and the directors of the company employed J. C. Van Fleet as the manager to sell their grain, and he was required to deposit the funds of the company in the St. John National Bank. The plaintiff had been selling grain to the defendant for the period of about five years, amounting to about 200 carloads, and except in the case of the two cars in question all of the sales were cash transactions and all the dealings between the parties were had with the defendant's agent, Van Fleet. Sometimes he forwarded cars to the defendant with a bill of lading attached; sometimes an open shipment was made and the wheat purchased at the market price, and in such a case the price was paid by sending a check payable to the plaintiff; and at other times, when they did not agree on the price of wheat, the car was forwarded to other dealers. As to the two cars in question, Van Fleet telephoned to the defendant not to send the price of the wheat to plaintiff, but to pay it to Goffe & Carkener, Kansas City grain brokers, who had an office or shop in Hutchinson in the building occupied by the defendant. On one side it is claimed that this

office was an ordinary bucket shop, and on the other side it is contended that while the concern dealt in futures, it was doing a lawful business, which contemplated a delivery of the grain in the future. On the request of Van Fleet the price of the first car, which amounted to $954, was held by the defendant and was paid out as follows: On June 29, 1910, the day of sale, $150; on July 1, $200; on July 14, $100; on July 28, $350; and on August 16, $154. For the second car, which contained 1150 bushels and was sold for $1035, the defendant paid $150 on September 14, 1910, which was two days after the wheat was sold, and another $200 on the same day, $200 on September 27, and $485 on September 29. The grain company had never speculated in grain, but it appears that Van Fleet had been speculating on his own account on the board of trade through Goffe & Carkener, and it is conceded that defendant knew that Van Fleet was speculating, and also knew that this money which he directed should be put up in margins had been lost in speculative transactions with the brokers. After the evidence had been introduced the court fairly instructed the jury on the question of agency, the scope of a general agent's authority to direct the manner of payment, but stated that the agent had no right to direct the payment of his individual debts out of his principal's money, and then left it to the jury to determine from the evidence whether or not the defendant, in the exercise of ordinary prudence, should have known that Van Fleet, in giving the directions as to payment, was acting outside of his authority.

The court, however, took from the jury the question whether money of the plaintiff which was held by defendant for a considerable time and then paid out on the order of Van Fleet to the grain brokers in driblets was a gambling transaction. In the ninth instruction the jury were told that:

"No testimony has been offered to show that the transaction between Van Fleet and Goffe & Carkener was a gambling or bucket shop transaction, or that it

was in any way illegal to the knowledge of the defendant, and you will therefore entirely disregard that question in making up your verdict."

There is little, if any, ground for complaint of the other instructions, but the transaction in question has some of the marks of illegality, and the knowledge of its character was brought so close to the defendant that the nature of the transaction should have been submitted for the determination of the jury. Under our statute pretended purchases and sales of commodities on the basis of market quotations, where the parties do not contemplate a *bona fide* receipt and delivery of the commodities, are gambling transactions. (Gen. Stat. 1909, §§ 5167-5169.) A contract for the sale. and delivery of a commodity at a future time, where there is a *bona fide* intention to make a delivery in accordance with the contract, is not of itself unlawful. (*Board of Trade v. Christie Grain & Stock Co.*, 198 U. S. 236, 248, 25 Sup. Ct. Rep. 637, 49 L. Ed. 1031.) If, however, the sale is a mere pretense, a wager on the rise and fall of market prices, and there is no intention to receive or deliver the commodity, it is contrary to public policy and a violation of the statute. In a recent case it was said that:

"Our statute was not intended to prevent contracts for future delivery of commodities when entered into in good faith and with an actual intention of fulfillment; its purpose was to suppress mere speculation where the commodity dealt in exists only in imagination, where no delivery is contemplated, but where, on the contrary, it is expected that the parties will settle upon the difference in the speculative market." (*Investment Co. v. McFarlin,* 93 Kan. 526, 529, 144 Pac. 842.)

If the dealings in question are gambling transactions and the defendant knew of their character and participated in the illegality, the payments made to the brokers can not be regarded as payments on the wheat purchased from plaintiff. Goffe & Carkener, the brokers, dealt in futures, and their agent who conducted

the business at Hutchinson testified that the contracts made by them for customers contemplated a delivery when a settlement was made. Van Fleet, however, had no wheat of his own to sell and deliver, and he stated that he was speculating for himself, and there is testimony in the record tending to show that he was dealing in imaginary wheat. While the dealings were in the form of contracts for future delivery, such forms are sometimes used as a cloak for mere betting on what the market prices will be at future times. It has been said that:

"It will not do to attach too much weight or importance to the mere form of the instrument, for it is quite certain that parties will be astute in concealing their intention, and the real nature of the transaction, if it be illegal. It may safely be assumed that parties will make such contracts valid in form; but courts must not be deceived by what appears on the face of the agreement." (*Barnard v. Backhaus, imp.*, 52 Wis. 593, 600, 6 N. W. 252, 9 N. W. 595.)

In that case it was said that:

"To uphold a contract in writing for the sale and delivery of grain at a future day, for a price certain, it must affirmatively and satisfactorily appear that it was made with an actual view to the delivery and receipt of the grain, and not as a cover for a gambling transaction." (Syl. ¶ 1.)

So courts scrutinize closely the transactions made by those who deal in futures and look beyond and behind the mere form of the agreement and at the circumstances connected with it. In *Investment Co. v. McFarlin*, supra, it was contended that as a legal contract for future delivery might be made, certain averments of fact were not inconsistent with legality, but the court said that it required too great a strain upon the credulity of courts to hold, on the facts stated, that the parties contemplated actual sales and deliveries. In *Carey v. Myers*, 92 Kan. 493, 141 Pac. 602, where there was a claim that the contracts were real sales and where there was a finding of validity by the trial court, this court

looked into the evidence and held that the transactions were but pretended sales and were made in violation of the statute.

Now, it is conceded that Van Fleet was speculating on his own account, and the defendant, in a written statement by its secretary and treasurer, recognized that the proceeds of the cars in question were lost by Van Fleet in speculative transactions. In view of the business which had been previously done by the defendant with Van Fleet and the company he was representing, there were good reasons for George Gano, who was conducting the business for defendant, to know that the transactions by Van Fleet were not *bona fide* sales. The plaintiff had never speculated, nor had it ever done what is called a "hedging business" through the defendant or any one else. George Gano was conducting the business of defendant, and his brother, Paul Gano, formerly employed by defendant, had a one-room office in defendant's building, in which there was a telegraph instrument, two or three desks, and a blackboard that could be used for furnishing market quotations. The brokers represented by Paul Gano had no grain elevator and did not buy or sell grain at Hutchinson. Van Fleet says that in speculating in wheat and in advancing money on margins he usually talked to Paul Gano, but sometimes with George Gano, and that he directed one or other of them to turn over so much money on margins. The defendant had never acted as a depositary for the plaintiff nor dealt with plaintiff otherwise than on a cash basis. The unusual course of holding the plaintiff's money through a period of about two months and dribbling it out to an agent of brokers dealing in futures on the request of Van Fleet, the close connection of George Gano with the agent of the brokers and the transactions in which he was engaged, and the testimony of Van Fleet that the defendant may have known of the character of the transactions, all together furnish a basis for an inference that the transactions were illegal and that the defendant was aware of their ille-

gality. The good faith and honesty of the transactions, and whether the defendant took part in them knowing that they were pretended rather than actual sales, were questions for the determination of the jury. If it had been found upon a proper submission of the question that the transactions were real and valid, the finding might have been upheld, but there is sufficient testimony tending to show illegality with the knowledge of the defendant to take the case to the jury.

It must be held that the giving of the ninth instruction was error, and therefore the judgment is reversed and the cause remanded for a new trial.